FREEDMAN, Adm'r, v. SULLIVAN et al.

No. 11430—Opinion Filed Dec. 18, 1923.

(Syllabus.)

1. Compromise and Settlement—Binding Effect of Voluntary Settlement.

Voluntary settlement of differences between parties in respect to their rights, where all have the same knowledge or means of obtaining knowledge concerning the circumstances involving their rights, and there is no fraud, misrepresentations, concealments, or other misleading incidents, must stand and be enforced, although the settlement made by the parties in their agreement might not be that which the court would have decreed to be, had the controversy been brought before it for decision.

2. Fraud—Written Contract—Quantum of Proof.

In this jurisdiction, where fraud is alleged in the procuring of a written instrument, the proof must sustain the allegations by a preponderance of the evidence so

great as to overcome all opposing evidence and repel all opposing presumptions of good faith.

**3. Contracts — Rescission—Restoration of Consideration.**

A party claiming the rescission of a contract must restore or offer to restore everything of value which he has received under said contract from the other party.

**4. Same—Affirmance of Judgment.**

Record examined, and held, the finding of the trial court that the contract of settlement and the deeds were not obtained by fraud is not clearly against the weight of the evidence.

Error from District Court, Kay County; J. W. Bird, Judge.

Action by Clinton D. Freeman (upon his death revived in the name of Ella J. Freeman, administrator) against Sam K. Sullivan and others. Judgment for defendants. and plaintiff brings error. Affirmed.

G. A. Chappell, T. J. Sargent, A. M. Lambright and W. M. Bowles, for plaintiff in error.

Geo. S. Ramsey, Sam K. Sullivan, and Felix Duval, for defendants in error.

McNEILL, J. The material facts in this case are substantially as follows:

In May, 1915, Henry Mooney was the owner of 160 acres of land in Kay county, Okla., incumbered with two mortgages, one for $3,500 and a commission mortgage for $245. Mr. Mooney lived upon this land as a homestead until 1913 or 1914, when he moved with his family to Colorado on account of his health and rented a farm adjoining 170 acres of land owned by Mr. Freeman. On the 10th day of May, 1915, Mooney and Freeman entered into a written contract whereby Mooney was to exchange the 160 acres of land in Kay county, subject to the $3,500 mortgage, for the 170 acres of land in Colorado belonging to Mr. Freeman, subject to two mortgages and some taxes amounting to approximately $14,-000. The contract provided Freeman was to have ten days to decide whether he would accept the contract, and if he did he was to notify Mooney. The contract further provided if the contract was accepted, either party might enforce the same by suit for specific performance or by action for damages. Within ten days Freeman notified Mooney he would accept the contract. Both farms were occupied by tenants and the contract provided the exchange of land was subject to the leases then on the land. No deeds were executed by either party. About the 2nd day of September, 1915, Mooney notified Mr. Freeman in writing that

he was ready to comply with the provisions of the contract and to make the deeds, but insisted there were certain penalties imposed by the companies holding the lien on the Colorado land which would have to be taken care of and that there was about five acres of the land that was used for public road, which would have to be adjusted, and there existed a lateral on the land which was used to irrigate the land lying adjacent thereto, and other parties had certain water rights in connection with the laterals, all of which would have to be adjusted before he would accept the deed. It may be conceded that Mooney was demanding certain adjustments that could not be met, and that the same would release him from the contract.

On September 11th, Mr. Freeman went to Mr. Mooney's house and handed Mr. Mooney an envelope with a deed enclosed to the Colorado land and a letter reciting his version of the title, and advising Mooney he was complying with the contract. He recited the fact that Mr. Mooney's land in Kay county was incumbered by a $245 mortgage which was not to be on the land. Mr. Mooney, the next day, returned the deed to Mr. Freeman by registered letter. Mr. Freeman refused to accept the registered letter from the post office, and on the 15th day of September brought a suit in Benton county, Colo., against Mooney for specific performance of the contract, and to require Mooney to execute a deed to the land in Kay county to Freeman. Mr. Mooney filed an answer, and set up certain defenses. The case was tried to the court, and on January 22, 1916, the court rendered judgment in favor of Freeman and against Mr. Mooney. The court found the deed tendered by Freeman to Mooney conveyed the land in Colorado, except the incumbrances of the lateral. The court further found that the existence of the lateral did not materially damage the property or diminish its use and was not sufficient encumbrance to justify the refusal of specific performance. The court then found that the value of the incumbrance did not exceed $150, and adjudicated the rights between the parties, but ordered specific performance.

Mooney then left Colorado and came to Kay county. The purpose was to absent himself from the jurisdiction of the Colorado court, and defeat the judgment of the court compelling him to execute a deed to the Kay county land. Thereafter, on the 5th day of April, 1916, the Colorado court entered a supplemental decree appointing the court clerk of said county a commissioner to execute a deed to Mooney's land

in Kay county to Freeman. Thereafter, in 1916, the land in Colorado was foreclosed and neither party received any benefit therefrom. Mooney claimed possession of the Kay county land and denied he ever had possession of the Colorado land, while Freeman contends that he had possession of the Kay county land and contends Mooney had possession of the Colorado land. Along in June, 1915, a hail storm damaged the house on the Colorado land, and Mooney had by arrangements with the tenant paid $50 for shingles and repairs. In August, 1915, Mooney applied for a loan for $8,000 on the Colorado land and executed a mortgage for said amount, but never received the consideration therefor. This was all before he had demanded a deed and before a deed was tendered.

In July, 1916, the commissioner appointed by the Colorado court made, executed, and delivered to Freeman the land in Kay county, Okla., as provided by the order of the Colorado court. This deed was placed of record in Kay county, Okla. The Colorado judgment was also filed in Kay county. Mooney, in 1911, had executed an oil and gas lease on the Kay county land to E. W. Marland, which was assigned to the Southwestern Oil Company. After Freeman placed his deed on record in Kay county, he executed an oil and gas lease to the Minnehoma Oil & Gas Company, and the lease provided it could not be assigned without the written consent of Freeman. Freeman then brought suit against the Southwestern Oil Company to cancel the lease assigned to it. Mr. Wentz was general manager of the Southwestern Oil Company and employed Sam K. Sullivan, Mr. England, and George Ramsey to defend the case for the Southwestern Oil Company. On June 12, 1917, Wentz compromised with Mr. Freeman, paying $2,000, and the Minnehoma Oil Company assigned its lease over to Wentz. On June 21, 1917, Freeman consented in writing to the assignment of the Minnehoma Oil Company lease to Wentz. During this time both Mooney and Freeman were claiming the land and both claimed possession. Mr. Freeman had employed Mr. Curran of Blackwell as his attorney to protect his interest in the land, and executed a note to Curran in the sum of $5,000 and secured the same by a mortgage upon the Kay county land. In addition thereto, he employed Wm. Blake of Tulsa, Okla., and gave him a note for $4,000 and secured the same by mortgage upon the Kay county land. Mr. Sam K. Sullivan was attorney for Mr. Mooney and had a contingent fee of 25 per cent. of the land for protecting Mr. Mooney's interest in the land. Mr. Sullivan had talked to Mr. Curran over the telephone about compromise and advised him it was his contention the deed executed by the commissioner under the order of the district court of Colorado was null and void, and referred him to a decision of the Supreme Court of the United States holding to that effect. to wit, Fall v. Eastin, 215 U. S. 1. He also advised Curran it was his contention that the statutes of limitation had run against the judgment in Colorado and the same could not be enforced in Oklahoma, for the reason that no suit had been brought on said judgment in Oklahoma within one year. Sullivan advised Curran they would give Freeman one-fourth interest in the land as a compromise. This, however- was not accepted by Curran. On June 22, 1917, Mr. Wentz went to the office of Mr. Curran and asked if he had any objection if he talked to Freeman about compromising the threatened litigation between Mooney and Freeman, and Curran advised him he had no objection. Wentz then went to see Freeman. Wentz and Freeman got in Wentz's car, and went to Sullivan's office in Newkirk, where the controversy was settled. A written contract of settlement was entered into, which is quite lengthy, reciting the history of the controversy, and provided Freeman should quitclaim the Kay county land to Mooney, and Mooney should by warranty deed convey to Freeman 37½ per cent. interest in the said Kay county land, and that Freeman should assume 37½ per cent. of the $3,500 mortgage on the land and 37½ per cent. of the $245 commission mortgage. It further provided Freeman should assume the mortgage he had made upon the land to Wm Blake in the sum of $4,000 and one to Mr. Curran in the sum of $5,000. This contract was signed and acknowledged and the deeds executed in accordance therewith. Mr. Wentz and Mr. Freeman returned to Blackwell that evening and met Mr. Curran and advised him Freeman had settled with Mooney. Mr. Curran remarked he did not think Sullivan would do him that way, and Wentz advised him it was not Sullivan's fault, that he (Wentz) had told Sullivan that he (Curran) had told him it was all right to settle. Curran asked Freeman how he settled, and Freeman refused to tell him. Freeman settled thereafter with Mr. Curran for $2,500, and also with Mr. Blake.

On the 22nd day of June, 1917, Mr. Mooney executed a deed to Mr. Sullivan for one-fourth interest in the land. Mr. Mooney, the next day, came to see Sullivan and said he was not getting quite as large an interest in the land as he thought he ought to have, and stated he would be satisfied with 40 per cent., and Sullivan

then executed him a deed to 2½ per cent. interest in the land. This gave Mooney 40 per cent., Sullivan 22½ per cent., and Freeman 37½ per cent. Mr. Wentz became interested in the controversy in about the following manner: On the 20th or 21st of June, 1917, he advised Mr. Sullivan he had compromised the oil suit with Mr. Freeman, and Sullivan suggested that, as he was so successful, he had better compromise the controversies between Mooney and Freeman. Mr. Wentz stated he would, providing he was compensated for doing it. On the 22nd day of June, before Freeman and Wentz came to Mr. Sullivan's office, Wentz called Sullivan over the telephone and wanted to know what he would receive if the case was compromised, and Sullivan advised him he was getting 25 per cent. and he would give him 12½ per cent. Thereafter a controversy arose between Sullivan and Wentz. Sullivan thought Wentz should only receive one-half of what Sullivan received, but this was not satisfactory to Wentz, so Sullivan deeded Wentz 12½ per cent. of the farm. The deeds of Sullivan to Mooney for 2½ per cent. and to Wentz for 12½ per cent. were not placed of record. The evidence further discloses that on the 17th day of June, an oil well was brought in on the land, making about 600 barrels per day. Some three or four months thereafter, Mr. Freeman sold 25 per cent. of the land for $45,000 and retained 12½ per cent. interest.

Just a year after the settlement, Mr. Freeman commenced this action against Mooney, Sullivan, and Wentz to set aside the contract entered into on the 22nd day of June, 1917, and the deed to Mooney, and the deeds from Mooney to Sullivan, and from Sullivan to Wentz, alleging the same were procured by fraud and without consideration, and to declare the deed made by the Colorado commissioner valid; and, second, to enforce the Colorado judgment; and, third, for specific performance, requiring Mooney to convey title under the contract executed in Colorado. The defendants answered, and among the defenses was the defense that Freeman had accepted the benefits of the transaction, and sold a portion of the land for $45,000 to an innocent purchaser, and was not in a position to rescind. The case was tried to the court, who made findings of fact and conclusions of law, and found the issues in favor of the defendants and against the plaintiff. From said judgment, the plaintiff has appealed.

The findings of the trial court were very lengthy, being 28 in number. The plaintiff in error first asserts that the finding of

the court wherein the court found there was no fraud in obtaining the compromise agreement is clearly against the weight of the evidence. The plaintiff in error contends that the contract entered into on the 10th day of May, 1915, in Colorado, after the same had been accepted by Mr. Freeman, transferred the equitable title in the Kay county land to Freeman, and from that time Mooney held the legal title in trust for Freeman. Second, that the judgment rendered in Benton county, Colo., wherein the defendant Mooney entered his appearance, filed his pleadings, and made no objection to the jurisdiction of the court, was a final judgment, and the judgment having been recorded in Kay county, where the farm was situated, and a deed executed by a commissioner appointed by the court in Colorado placed upon the record in Kay county, the title became absolute in Freeman. The third proposition, if the court should hold that the Colorado judgment had no extra-territorial effect and in so far as it affected the land in Kay county was ineffectual to pass title, then the action is an original action brought in Kay county for specific performance of the Colorado contract. Fourth, that the compromise agreement entered into on June 27, 1917, and the deeds made in accordance therewith were obtained by fraud and without consideration. In regard to the fraud, the acts relied upon may be summarized as follows: First, that Wentz occupied a confidential relation with Mr. Freeman and acted as his agent in the transaction in making said settlement and induced him to make said settlement, and concealed from Mr. Freeman the fact that he was receiving one-eighth interest in the land from Sullivan for making said settlement. Second, Mr. Wentz was the agent of Mr. Sullivan and Sullivan would be bound by any representations made by Mr. Wentz. Third, that Sullivan misrepresented the law to Mr. Freeman when he stated the Colorado judgment was barred by the statute of limitations and the deed executed by the commissioner in Colorado to the Kay county land was void.

It is unnecessary for us to decide whether the deed made by the commissioner in Colorado to the Kay county land was void. Mr. Sullivan contended the same was void, and replied upon the case of Fall v. Eastin, 215 U. S. 1, and had notified Mr. Freeman's attorney, to wit, Mr. Curran. Mr. Curran testified he advised Mr. Freeman that his case was doubtful and it would be best to compromise the case if he could get a satisfactory compromise. Whether the United States decision would be controlling in the case at bar, it is unnecessary for us to

determine, but it is sufficient to say the question is not free from doubt.

This court in a long line of cases has announced the rule, to wit: .

"Voluntary settlement of differences between parties in respect to their rights, where all have the same knowledge or means of obtaining knowledge concerning the circumstances involving their rights, and there is no fraud, misrepresentations, concealments, or other misleading incidents, must stand and be enforced, although the settlement made by the parties in their agreement might not be that which the court would have decreed to be had the controversy been brought before it for decision."

See Young v. Stephenson, 82 Okla. 239, 200 Pac. 225; Tracy v. Norvell, 81 Okla. 94, 196 Pac. 929.

Whether the statute of limitations had run against the judgment entered in Colorado and the right to enforce the judgment in this state as a foreign judgment was barred, is also a question that was not free from doubt. More than one year had transpired since entering the judgment in Colorado court. It was a question over which the attorney for Mr. Freeman and the attorney for Mr. Mooney did not agree, or at least had not agreed, nor do the parties agree in this court. The attorneys for both sides had the same opportunity to investigate the law. It certainly cannot be said that Mr. Mooney's claim was not a substantial claim. It certainly was not fictitious. In regard to the statement made by Mr. Sullivan to Mr. Freeman that he considered the deed made by the commissioner void, and that the statutes of limitation had run against the judgment in Colorado and the same could not be enforced in the state of Oklahoma as a foreign judgment, these were statements that had been made prior thereto to Mr. Freeman's attorney. Mr. Freeman's attorney had also advised Freeman that his claim was doubtful; if it was doubtful, it was by reason of these two questions of law. Under the facts, these representations, under the circumstances, could not be the basis of an action for fraud.

We will next consider the question of fraud as it relates to Mr. Wentz. Mr. Freeman testified that he considered Wentz as his agent in making the compromise and that Mr. Wentz was acting for him, when in fact Mr. Wentz concealed the fact that he was representing Mr. Sullivan and receiving compensation from Mr. Sullivan. If the above facts were proven, fraud would be established. The court found, as a matter of fact, Wentz was not the agent of Freeman and there was no confidential or fiduciary relation existing between Wentz

and Freeman, and that Wentz made no false representations to Freeman, and there was no fraud practiced to induce him to enter into the settlement. In regard to whether any fiduciary or confidential relations existed between Mr. Wentz and Mr. Freeman, the evidence disclosed that Mr. Wentz was general manager for the Southwestern Oil Company and Mr. Freeman had brought suit to cancel the lease held by his company and this matter had been in litigation for some time, and was not finally settled until the 21st day of June, 1917, or the day before the contract was entered into. So, instead of the parties occupying a confidential relation, the interest of Mr. Wentz had been antagonistic to the interest of Mr. Freeman. Mr. Freeman testified as follows:

"A. I thought that was the best I could do; they were talking of bringing suit against me; Mr. Wentz told me I was going to lose the whole thing and he was going to help Mooney to fight it. Q. Yes, he told you that? A. He thought I had a good title to the place by having it in possession as long as I did; he told me a time or two he didn't doubt my possession at all. Q. Well, Wentz told you he was going to help Mooney to fight it? A. Yes. Q. Told you that right there? A. Yes; said that they would beat me on it. * * * Q. How came you to go with him to the oil fields? Go ahead and tell the court. A. All right. He came over there and he wanted to know if I wanted to go over to the oil fields with him; he was going to drive over; I told him yes, I would like to go along, and I wanted Mr. Curran to go along. Mr. Curran said he couldn't go, and we went, and now I think we stopped at the old farm, but to swear to that, I can't; I don't really remember rightly whether we stopped or whether we came on here, but I think we stopped at the oil fields, and coming on over here, he says: 'Mr. Freeman, don't you think you better compromise this thing? If you go on with this you will get beat?' 'No,' I says, 'I have had that farm now in my possession nearly two years and that farm belongs to me.' 'Well,' he says, 'I know rightfully it does.' 'Well,' I says, 'they can't beat me out of that farm; I have had peaceable possession there now for nearly two years, lacking only a couple of months, a year and ten months, and I hired Mr. Winkler to look after it,' and I says. 'He took possession up there; the roof was hailed off the house,' I says, 'and he put it on again; he knew he had that farm in possession up there and I had this in possession down here.' 'Well, now,' he says, 'we will drop that,' and we went on. I finally told him I would give him 40 acres of the farm, offered him as much as 40 acres; he said he wouldn't consider it at all."

This testimony does not support the allegations that Mr. Freeman was relying upon

Mr. Wentz or that Mr. Wentz was his agent. Certainly one could not contend the party was his agent when the party advised him he was going to assist the other party to defeat him in a lawsuit, where the title to the land in controversy was involved. He further testified that when he and Wentz went into Sullivan's office that Sullivan inquired where Curran was, and Sullivan said he would call Mr. Curran. There is a conflict over exactly what was said at this time. Mr. Sullivan; testified that when Wentz telephoned him they were coming over to make a settlement, he supposed Mr. Curran was with them, and when they came in, he asked where was Curran, and Mr. Freeman replied he did not come, and said, "If we are going to make a settlement we don't need him," and Sullivan replied he did not want to make a settlement without Curran there, and turned to the telephone and took down the receiver to call Mr. Curran, when Mr. Freeman replied: "Now, if we are going to make a settlement, there is no use to argue the law. I don't know anything about it, and I would not know anything about it if my lawyers were here, but I do know whether I want to settle or not, and that Curran knows that I am here to make a settlement." Sullivan then offered Mr. Freeman 25 per cent. of the land, and Freeman refused, and after talking he made an offer of 37½ per cent. provided Mooney would agree to it. Freeman accepted this offer, and Sullivan and Wentz went to see Mooney. Freeman stated he did not want Mooney in the office, and if they brought him there, he would leave. Wentz and Sullivan saw Mooney and returned to the office and the contract was drawn up. Mr. Wentz testified regarding the lawsuit between Freeman and his company and settling the same, and when he advised Sullivan, one of his attorneys, of settling the lease case, Sullivan suggested that he might settle the Mooney controversy. Wentz replied he would if he was properly compensated. On the 2nd of June, he went to Blackwell and called at the office of Mr. Curran, attorney for Freeman, and told him he wanted to make a settlement with Freeman in the Mooney matter, and asked if he had any objection to him talking to Freeman, and Mr. Curran advised him that he had none. That he then found Freeman and told him he wanted to make a settlement in the Mooney case and suggested they go to Sullivan's office, and Freeman went to see Curran and Freeman advised him Curran did not want to go. On going from Blackwell to Newkirk they discussed the question of settlement; several propositions were made, and when they got to Sullivan's office Freeman and Sullivan made all the negotiations. He stated he advised Mr. Freeman that from what he had learned in the case of Freeman against the Southwestern Oil Company, Freeman's attorney had been sleeping on his rights and he did not think he had a very good case. There is testimony that after the compromise agreement was made, Mr. Freeman did not want the deeds put on the record for a few days until he could settle with his attorneys, Mr. Curran and Mr. Blake, and that he did not want them to know exactly what he got out of the settlement.

In regard to the Kay county land, it was in possession of tenants, both sides contending they had possession and both scrambling for the rent; each party in the controversy was seeking to gain some advantage over the other. This resulted in a bitter feeling between Mooney and Freeman. It is further contended that Mr. Freeman was an old man over 70 years of age, and unable to cope with Mr. Wentz and Mr. Sullivan. The evidence, however, disclosed that he was a man of considerable ability, owning considerable land in Colorado. Mr. Freeman made no objection to the settlement, no objection that the settlement was not fair, and he was apparently satisfied with 37½ per cent. of the land and sold 25 per cent. of the same for $45,000. About a year after he learned that Mr. Wentz had received 12½ per cent. of the land unbeknown to him. It can readily be seen why both parties were desiring to compromise. A well had been drilled on the place making about 600 barrels of oil per day. Under the conditions of the title, both sides were claiming the land; neither Mooney nor Freeman would have been able to collect the royalties until their controversy had been settled by litigation, which had not been started by either side, and might have been drawn out for several years. Mr. Freeman does intimate that he did not know that oil had been brought in on the premises, but admits that he was in Blackwell all the time and the land was close there, and it was also testified the bringing in of the well caused a great deal of excitement in that community, as it was the first well in the shallow sand that produced oil in that community and was a subject talked about freely.

The rule announced in this court in a long line of decisions is, in order to set aside a deed or contract, the burden is upon the party seeking to set the same aside to establish the fraud by clear and convincing evidence, with a preponderance so great as to overcome all opposing evidence and presumption of good faith. See Owen v. U. S. Surety Co., 38 Okla. 123, 131 Pac. 1091; Adams v. Porter, 58 Okla. 225, 158 Pac. 899.

The finding of the trial court that Wentz was not Freeman's agent is not clearly against the weight of the evidence. If he was not the agent, there was no fraud. We think another reason why the judgment in the trial court should be affirmed is, if Freeman is entitled to have his case tried upon the merits, Mooney is likewise entitled to a trial de novo, and in order to rescind the contract for fraud the rule announced by this court in a long line of cases is as follows:

"A party claiming rescission of a contract must rescind or offer to restore everything of value which he has received under said contract to the other party."

See Freeman v. Camp, 53 Okla. 385, 156 Pac. 1193; Nelson v. Golden, 84 Okla. 29, 202 Pac. 208. Freeman cannot be heard to say, "I placed one-fourth of the land beyond the reach of the court and received $45,000 therefor, and should the court decree that I am not entitled to specific performance or the deed of the commissioner in Colorado was void, or the Colorado judgment was barred by limitations, and find against me, I have received benefits from the contract, and it cannot be taken away from me." This court in a long line of decisions has announced the rule that a party will not be permitted to repudiate his contract, and still retain the benefits which he has derived from it. The rule is well settled that where a party desires to rescind a contract, procured through fraud of the opposite party, of which fraud he was ignorant at the time he entered into the contract, and thereafter discovered the fraud, he must restore to the other party everything of value which he has received under the contract, or he must offer to rescind the same upon condition that such party shall likewise rescind unless the latter is unable to or absolutely refuses to do so. Under the contract of settlement, Freeman and his assignees have received 37½ per cent. of the royalties and he has placed one-fourth interest in the land in the hands of innocent purchasers. Certainly he cannot go into court of equity and say. "Even should I lose my interest, I can only lose 12½ per cent. of the land, while if I win, I can gain 62½ per cent. or five-eighths."

Counsel, however, contends that Freeman owned all the land and that his five-eighths was given away without any consideration. In that we cannot agree. The question of whether he owned any of the land was a question over which there was a legal and bona fide controversy. Nor can we consider that the equities of Mr. Freeman appeal very strongly to a chancellor. Mr. Mooney was the owner of this land, which

later proved to be very valuable. Mr. Freeman was trading a supposed equity in Colorado land for the land in question, and under the record in this case, the land in Colorado when sold brought, a year thereafter, no more than the incumbrance upon it. Mr. Mooney never received anything of value for the interest he transferred to Mr. Freeman.

For the reasons stated, the judgment of the trial court is affirmed.

JOHNSON, C. J., and NICHOLSON, COCHRAN, and MASON, JJ., concur.